IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STAMATIS FERAROLIS             :        CIVIL ACTION
                               :
        v.                     :
                               :
INTERNATIONAL RECOVERY         :
SYSTEMS, INC., et al.          :        NO. 04-5080

ORDER AND OPINION

JACOB P. HART                          DATE:  May 18, 2006
UNITED STATES MAGISTRATE JUDGE

Following a jury verdict in this case, plaintiff has filed a motion for judgment as a matter

of law under F.R. Civ. Pr. 50, or, in the alternative, for a new trial, under F.R. Civ. Pr. 59.

Defendants have filed a motion under Rule 59 for a new trial on their counterclaims only.  For

the reasons set forth below, both motions will be denied.

I.      Factual and Procedural Background

Stamatis Ferarolis brought this action to recover $360,922 under a "phantom stock" plan

("the Plan") offered by his former employer, International Recovery Systems, Inc. ("IRS"), an

automobile repossession service.  The Plan, adopted on July 1, 2003, provided that "certain key

employees" would receive deferred compensation in the form of non-equity "shares" which

could be cashed in after the third year anniversary of the grant of the shares or upon the

termination of employment with IRS.  Plan, attached as Exhibit A to Complaint.

The Plan provided that the worth of the shares on the date they were cashed in would "be

an amount equal to the Calculated Value of a share of the common stock of the Company as

determined by the valuation method adopted and employed by the Company."  Id. at ¶ 7.  The

valuation method was set forth in an attachment:

> The basic methodology for valuing a company uses a capitalization rate calculated on the difference between the average earnings of the company over three years, subtracted from the average earnings over 5 years.  If the difference is positive, the company is growing the earnings.  If the difference is negative, the earnings growth is diminishing.

Id. at Exhibit A, "Calculated Value."  Thus, the value of the phantom shares depended on the rate of IRS's growth.

The Plan provided that a committee designated by IRS shareholders would have "authority to interpret the Plan, to determine the conditions subject to which any awards may be made or payable, and to make any other determinations which it believes necessary or advisable for the administration of the Plan."  Id. at ¶ 2.  Further, the Plan provided that a participant's right to redeem his shares would be forfeited if he was "discharged from employment with the Company for 'cause'."  Id. at ¶ 6(d).

Ferarolis asserted a right to redeem his shares in August, 2004, when he resigned from IRS upon moving back to Florida, his home state.  He based his claim for $360,922 on a valuation given to him by Robert Geisel, IRS's controller.  After some negotiation, Ferarolis filed this action.  He named as defendants IRS; Geisel; Richard D. Turner and Franklin C. Boyer, who are owners and officers of IRS; Turner Boyer Investments, ("TBI"), IRS's parent company; and Resource Services Group, another business related to TBI.  Ferarolis asserted a claim under the Pennsylvania Wage Payment and Collection Law, 43 Pa. C.S.A. § 260.1, et seq., and a breach of contract claim.

At trial, the Defendants maintained that Ferarolis was not entitled to any payment under the Plan, for two reasons.  First, they argued, IRS had been losing money for several years by 2004, so that the Calculated Value of Ferarolis's shares was zero on the day of his departure.

Geisel, they claimed, simply used a wrong formula to calculate the value of the shares. Specifically, Geisel testified that, in calculating IRS's earnings, he had wrongly added back in depreciation and the annual fees withdrawn by TBI under its management contract with IRS. Transcript at 2.286-287.

Secondly, Defendants argued that Ferarolis would have been terminated for cause, had they known that – as they alleged – he violated his non-compete agreement with IRS by taking steps to start his own auto repossession business while he was still employed by IRS. Defendants maintained that Ferarolis also violated a "computer agreement" whereby he had contracted to use his office computer for office business only.

Defendants also asserted counterclaims against Ferarolis for tortious interference with contract, breach of contract, conversion and breach of fiduciary duty, based on his alleged violation of (a) the Plan; (b) the non-compete agreement; and (c) the computer agreement.

This case was tried before a jury on February 3-8, 2006. On the verdict sheet, the jury was asked two questions. The first read: "What was the value of Plaintiff's Phantom Stock on the day of his resignation?" The jury was able to choose between $360,922, the amount Ferarolis claimed, and $0, the amount claimed by Defendants. The jury checked off $0. The second question was: "Would the defendants have fired Plaintiff for 'cause,' as that term in used in the Phantom Stock Agreement, had they known of his conduct before the date of his resignation?" Given the choice between "yes" or "no," the jury selected "no." Accordingly, a verdict was entered against Ferarolis on the case in chief, and against Defendants on their counterclaims.

3

II.    The Post-Trial Motions

In his post-trial motions, Ferarolis asserts that he is entitled to judgment as a matter of law because the Court was compelled to interpret the Plan to find that the value of his phantom shares was $360,922.  He then argues that if Geisel indeed erred in calculating the shares, this constituted unilateral mistake which would not release IRS from being bound by Geisel's calculations.  Thirdly, Ferarolis maintains that the Court should not have permitted IRS to argue at trial that it had been losing money, since that was not a position it took in its answer to his complaint, or during discovery.

Fourthly, Ferarolis argues that the Court erred in excluding from evidence Exhibit P-23, a letter to him from Richard Turner, in which Turner cites Geisel's calculation of the value of the shares.  With that letter, he argues, he "would have been able to show that IRS invented its theory [of financial losses] long after it determined the calculated value due Ferarolis under the Plan."

Finally, Ferarolis maintains that Defendants were culpable as a matter of law under the WPCL, because they failed to either pay Ferarolis within sixty days of his demand, or notify him within that time that there was a dispute as to the amount of his claim, as required by 43 P.S. § 260.06.

In opposition to this motion, Defendants argue that Ferarolis waived his right for judgment as a matter of law under Rule 50, because he failed to move for this remedy at the close of his case at trial.  They also argue that Ferarolis's motion under Rule 59 should be dismissed for his failure to make arguments specifically supporting such a motion.  Defendants also argue, on the facts, that Ferarolis is not entitled to relief.  In their motion for a new trial on their counterclaims, Defendants simply argue that the verdict reached by the jury was against the

4

weight of the evidence.  They argue that "in view of [Feraolis's] treacherous behavior, the jury's

decision to exonerate [him] on the counterclaims should not stand."

III.    Legal Standards

A.    Rule 50:  Judgment As a Matter of Law

In Russ-Tobias v. Pennsylvania Board of Probation and Parole, Civ. A. No. 04-270, 2006

WL 51677 (E.D. Pa. Mar. 2, 2006), the Honorable Thomas O'Neill of this court concisely

summarized the law respecting Rule 50:

> "A motion for judgment as a matter of law under Federal Rule 50(a) should be
> granted only if, viewing the evidence in the light most favorable to the nonmoving
> party, there is no question of material fact for the jury and any verdict other than
> the one directed would be erroneous under the governing law."  Marinelli v. City
> of Erie, 216 F3.d 354, 359 (3d Cir. 2000) quoting Beck v. City of Pittsburgh, 89
> F.3d 966, 971 (3d Cir. 1996) (internal quotations omitted); Macleary v. Hines,
> 817 F.2d 1081, 1083 (3d Cir. 1987).  In other words, "[s]uch a motion should be
> granted only if, viewing the evidence in the light most favorable to the nonmovant
> and giving it the advantage of every fair and reasonable inference, there is
> insufficient evidence from which a jury reasonably could find liability."
> Lightening Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).
> "Although judgment as a matter of law should be granted sparingly, a scintilla of
> evidence is not enough to sustain a verdict of liability.  The question is not
> whether there is literally  no evidence supporting the party against whom the
> motion is directed but whether there is evidence upon which the jury could
> properly find a verdict for that party."  Id.  (internal quotations and citations
> omitted).

Id. at *4.

B.    Rule 59:  Motion for a New Trial

Under Federal Rule of Civil Procedure 59, a new trial may be granted following a jury

trial "for any of the reasons for which new trials have heretofore been granted in actions at law in

the courts of the United States."  In the Third Circuit, "a new trial is appropriate only when the

verdict is contrary to the great weight of the evidence or errors at trial produce a result

5

inconsistent with substantial justice." <u>Roebuck v. Drexel University</u>, 852 F.2d 715, 735-36 (3d Cir. 1988); <u>Le Page's Incorporated v. 3M</u>, Civ. A. No. 97-3983, 2000 WL 280350 at *8 (E.D. Pa. Mar. 14, 2000); <u>Sandrow v. United States</u>, 832 F. Supp. 918, 918 (E.D. Pa. 1993).

The trial court has broad discretion when the asserted ground for a new trial is a ruling on a matter that initially rested within the discretion of the court, such as an evidentiary ruling or jury instruction.  <u>Klein v. Hollings</u>, 992 F.2d 1285, 1289-1290 (3d Cir. 1993); <u>Lind v. Schenley Industries, Inc.</u>, 278 F.2d 79, 89 (3d Cir. 1960); <u>Russ-Tobias</u>, <u>supra</u>, at **4-5 (E.D. Pa. Mar. 2, 2006), and <u>Farra v. Stanley-Bostitch, Inc.</u>, 838 F. Supp. 1020, 1026 (E.D. Pa. 1993).

Nevertheless, the trial court need not grant such relief liberally.  A decision to admit or reject testimony under Rule 403 has been found to be reviewable only under an "arbitrary and irrational" standard.  <u>Robert S. v. Stetson School, Inc.</u>, 256 F.3 159, 170 (3d Cir. Jul. 3, 2001); <u>Bhaya v. Westinghouse Electric Corp.</u>, 922 F.2d 184, 187 (3d Cir. 1990), <i>cert. denied</i>, 501 U.S. 1217 (1991).

Where the motion for a new trial is based on such an assertion of legal error, the court conducts a two-step analysis.  First, the court determines whether it erred at trial; if so, it then determines whether its error was so prejudicial that refusal to grant a new trial would be "inconsistent with substantial justice."  <u>Farra</u>, <u>supra</u>, at 838 F. Supp.

Similarly, where the asserted ground is that the verdict is against the weight of the evidence, a new trial should be granted only where permitting the verdict to stand would result in a miscarriage of justice.  <u>Klein</u>, 992 F.2d at 1290; <u>Lind</u>, 278 F.2d at 90, and <u>Russ-Tobias</u> at *5.

C.      The Law Governing Ferarolis's Motion

As noted above, Defendants maintain that Ferarolis waived his right to ask for judgment

as a matter of law under Federal Rule 50, by failing to move for such relief at the close of

evidence.  They further maintain that Ferarolis's motion under Rule 59 should be dismissed for

his failure to make arguments specifically supporting such a motion, rather than his Rule 50

motion.

Defendants are correct in stating that Ferarolis waived his right to Rule 50 relief by

failing to move for it before the matter was submitted to a jury.  Greenleaf v. Garlock, Inc., 174

F3d 352, 364-365 (3d Cir. 1999), citing Yohannan v. Keene Corp., 924 F.2d 1255, 1261 (3d Cir.

1991).

In any event, the claims Ferarolis has put forth are not within the scope of Rule 50.  As is

evident from the language of the rule ("*if ... a party has been fully heard on an issue and there is*

*no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue ...*

"), and from the Russ-Tobias explanation above, Rule 50 is used to challenge the sufficiency of

the evidence considered by the jury.  For example, in Greenleaf, the moving party presented "a

classic insufficiency of the evidence argument claiming that the evidence does not support a

finding that it is liable for Greenleaf's injuries", as well as an argument that "the verdict

absolving the non-appearing defendants is against the overwhelming weight of the evidence."

174 F.3d at 352.

Although Ferarolis has made a passing reference to insufficiency of the evidence, the only

arguments he has specifically set forth and supported with argument and citations relate to

alleged legal errors made by the Court; a few allege wrong evidentiary rulings, and others

7

challenge the Court's failure to decide certain issues as a matter of law.  A Rule 50 motion is not

appropriate in this context.

On the other hand, the matters he has raised are properly decided in a motion for a new

trial under Federal Rule 59.  The above discussion of this rule makes it clear that the basis for a

Rule 59 motion may be a ruling on a matter that initially rested within the discretion of the court.

See  Klein v. Hollings, supra.  I will therefore consider Ferarolis's arguments under Rule 59.

IV.    Discussion

A.     Ferarolis's Motion

1.     Entitlement to $360,922 As a Matter Of Law

Ferarolis argues that the value of his phantom shares should have been determined by the

Court as a matter of law, and not submitted to the jury, because the Plan was unambiguous.  "A

contract is ambiguous if it is reasonably susceptible of different constructions and capable of

being understood in more than one sense."  Hutchison v. Sunbeam Coal Corp., 519 A.3d 385,

390 (Pa. 1986).  Ferarolis maintains that the other "sense" put forth by the Defendants was

unreasonable.  Since IRS and TBI (a company solely owned by defendants Turner and Boyer)

fixed the consulting fees payable to TBI, IRS could always arrange its affairs to show

consultation fees so high that they eliminated any "earnings" for the purposes of Exhibit A to the

Plan.  That way, IRS did not need to ever show growth and would therefore never be required to

value Plan shares at more than zero.

Ferarolis has shown that Defendants' interpretation of the Plan is unfavorable to him.  He

may even have shown that, under this reading, the Plan offered him the equivalent of a big

handful of air.  But this is not to say that the Defendants' interpretation of the Plan is so

8

implausible that it must be rejected as a matter of law.  There is no plain language in the Plan which would preclude it.  Indeed, the plain language tends to cut against Ferarolis's reading, giving full authority for the interpretation of the Plan to a Committee of IRS shareholders or their designees.  Plan at ¶ 2.

Accordingly, the Plan is ambiguous with respect to the permitted method of assessing the value of its shares.  Therefore, the interpretation of the Plan in this regard was a matter of fact rightly given to the jury to decide.

2.    Unilateral Mistake

Secondly, Ferarolis maintains that the Court should have precluded Defendants from arguing that Geisel's valuation of the shares at $360,922 was erroneous.  He argues that this amounted to a defense of unilateral mistake, which was waived by Defendants' failure to raise it in their answer to his Complaint.  He points out that under Pennsylvania law, a unilateral mistake relieves a party of its obligations under a contract only when it can be shown that the other party was guilty of fraud or bad faith.  Warren v. Greenfield, 595 A.2d 1308, 1312 (Pa. Super. 1991).

Ferarolis points to Raiczyk v. Ocean County Veterinary Hospital, 377 F.2d 266 (3d Cir. 2004), a case which he calls "remarkably similar" to his own.  In actuality, however, that case is crucially different, as I will explain.  The difference between the two cases highlights the flaw in Ferarolis's argument.

In Raiczyk, a veterinary partnership was subject to a shareholder's agreement (or "sales agreement") providing for the mandatory buyout of a departing partner's shares at a value to be determined at the time of departure.  Raiczyk, a departing partner, signed and initialed a closing statement prepared by the remaining partners, specifying the value of his shares.  Id. at 268.  He

9

then faxed the statement to the defendants' attorney, and later had his signature on the document notarized.  Id.  He subsequently sued on the basis that the value of his shares had been incorrectly calculated, asking for reformation of the closing statement on the basis that he was in a hurry on the day that he signed it, and did not have the document reviewed by a lawyer or accountant, and thus only later caught the mistake.  Id. at 268-269.

The jury awarded Raiczyk the extra compensation he sought.  The District Court, however, granted a Rule 50 motion in favor of the defendants.  The Court of Appeals for the Third Circuit affirmed the District Court in its decision that:

> [E]ven though the sales agreement may have been unclear as to the final price of the shares of stock, the April 17th closing letter was unambiguous.  Dr. Raiczyk's argument that he had mistakenly signed the closing letter in a  hurry did not qualify for application of the doctrine of unilateral mistake and did not warrant reformation of the contract.

Id. at 269, 270.

Clearly, the crucial difference between Raiczyk and Ferarolis's case is that Raiczyk was asking for the reformation of a letter contract which he signed and notarized, specifying the amount of money he was to receive.  Ferarolis and the Defendants, by contrast, never entered a contract stating that Ferarolis would receive $360,922.  The only contract at issue in this case is the Phantom Stock Agreement which, like the sales agreement which the Raiczyk court called "unclear", gave Ferarolis a right to the value of certain shares but did not give a promise of any specific amount of money.

Defendants' argument that Geisel had erred in his earlier representations to Ferarolis about the value of his shares did not, therefore, amount to a request to reform a contract on the basis of unilateral mistake.  Ferarolis's argument that Defendants could not make out the defense of unilateral mistake is essentially besides the point.

10

Further, this would not be proper grounds for a Rule 59 motion because the argument could have been, but was not, raised during trial.  Venerable commentators Wright and Miller have said in their commentary on Rule 59: "A party may not seek a second trial on the basis of a theory not urged at the first trial."  Charles Allan Wright & Arthur R. Miller, 11 <u>Federal Practice and Procedure</u> § 2805 (1973).

Ferarolis did not make this argument to the jury, even though Defendants claimed in their response to his motion for summary judgment, filed on November 21, 2006, that Geisel's figures were erroneous, giving him over two months' time to prepare to meet this defense.  He did not object to the specific question on the verdict sheet that permitted the jury to value the phantom stock at either $360,922 or zero.  In fact, the question was drafted by plaintiff's counsel.

3.    <u>Defendants' Argument that IRS was Losing Money</u>

Ferarolis maintains that IRS should not have been permitted to argue at trial that IRS had been losing money for the few years before Ferarolis's departure.  As Ferarolis points out, Defendants did not raise this argument in their answer to his Complaint, arguing only that Ferarolis's actions waived his rights under the Plan.

Nevertheless, as noted above, Defendants argued in their response to Ferarolis's motion for summary judgment that Geisel's figures were incorrect and that the value of Ferarolis's shares was zero, because IRS was losing money.  At that point, Ferarolis did not have complete copies of IRS's tax returns, although he had M - 2 schedules.  In fact, it was represented in conferences with the Court and all counsel that Ferarolis had requested the complete returns in discovery, had not received them, and had decided, as a strategic matter, not to file a motion to compel their production.

11

Despite the fact that trial was not scheduled for almost two months after Defendants'
response was filed, Ferarolis did not seek to obtain the returns at that time, through a belated
motion *to compel*.  He did not argue in a reply memorandum that IRS had no right to raise this
defense, and he did not file a motion *in limine* to preclude this argument at trial.

Given these circumstances, I permitted Defendants to question Ferarolis on cross-
examination about IRS's 2003 tax return to show a loss in that year.  Transcript at 1.84-85.
When Ferarolis's counsel cross-examined Turner, moreover, I would not permit her to ask
questions about the absence of the tax returns which suggested that they were concealed by the
Defendants.  The following exchange took place:

> COUNSEL FOR FERAROLIS:  You didn't – you only submitted M-1s for one
> year, is that correct, for 2004?
>
> TURNER:  Counselor, we submitted –
>
> COUNSEL FOR DEFENDANTS:  Judge, we'll be happy to provide every one
> back to 1997, they're available.
>
> THE COURT:  [Addressing counsel for Ferarolis] I think we ought to get off this
> irrelevant baiting of the witness.  We've been over *ad nauseam* why the other tax
> returns aren't here.  [Counsel for Defendants] has offered to produce them ... So,
> why don't you just cross-examine the witness based on what he's said on direct
> and move on?

Transcript at 2.183-184.

Later that afternoon, counsel for Defendants moved to admit IRS's tax returns into
evidence:

> COUNSEL FOR DEFENDANTS:  If your Honor pleases, I would mark as –
> collectively – as D-27.  These are all of the tax returns for IRS for the years 1996
> up through – I believe – 2004.  And I'm – if your Honor please, I'd like to present
> them to counsel.  And I would solicit a stipulation from counsel that on last March
> 15th, 2005, I gave her the M-2s, which are the calculations of income and loss

from these same returns.  I provided your Honor with her correspondence to me to that effect.  I would ask you to stipulate that she had those eleven months ago.

COUNSEL FOR FERAROLIS:  I will stipulate that I had the M - 2, but they are not what you propose to attach as an exhibit in this case.  You propose to attach only the 2004 tax return in its entirety.

THE COURT:  Well, he's – he's now offering up the entire – all of the complete tax returns back to 1996 and he's handing them to you.  And – I know you're – you're very busy while you're on trial, but if you  have time between now and tomorrow to look at them or have Mr. Ferarolis look at them, and – and some questions come as a result, I'll give you an opportunity to pursue them with the appropriate witnesses.

Transcript at 2.236-237.

At the beginning of the next day, Ferarolis's counsel stated that she would put her client on the stand to testify that, based on the tax returns, "TBI was pulling out tremendous amounts of money with the – the management fees and with other fees as well."  Transcript at 3.2.  However, she later told the Court:  "[W]e have decided not to put on that additional evidence."  Id. at 67.

It is apparent therefore, that, because Ferarolis took no action before trial to prevent IRS from arguing that it was losing money, he waived this issue as a matter for relief under Rule 59.  Just as importantly, it is also apparent that Ferarolis knew of Defendants' intention to claim that IRS was unprofitable no later than November 21, 2005, and had ample time to prepare for this at trial.  He was not, therefore, as he now claims "deprived of the ammunition to refute this argument."  Accordingly, I did not err in permitting Defendants to argue at trial that Ferarolis's shares were worthless because IRS had been losing money.

4.      Exhibit P-23

As a related matter, Ferarolis argues that the Court was wrong in granting Defendants' motion in limine excluding from evidence a letter, marked P-23.  In that letter, dated October 25, 2004, counsel for Defendants wrote to counsel for Ferarolis:

13

I know that you have set up a "deadline" for today in reference to the possibility of settling this case. The simple answer to your principle question is that we cannot pay you $250,000 today. We are willing to work through IRS to pay Mr. Ferarolis the money he is owed over time.

P-23.

In response to Defendants' motion *in limine*, I excluded this letter under FRE 408, which precludes the admission of offers to settle, as well as "conduct or statements made in compromise negotiations." Ferarolis argued at the time that the letter constituted an admission that the money was owed, rather than a dispute as to the claim itself. He pointed to the 1972 Advisory Committee Note to Rule 408 stating that "the policy considerations which underlie the rule do not come into play when the effort is to induce a creditor to settle an admittedly due amount for a lesser sum ... Hence, the rule requires that the claim be disputed as to either validity or amount."

Nevertheless, the very language of the letter, referring to a "possibility of settling the case," and the fact that the letter was between counsel and not between the parties, convinced me that, at the time the letter was written, discussions had "crystalized to the point of threatened litigation." See Cook Associates, Inc. v. PCS Sales, 271 F. Supp.2d 1343, 1348 (D. Utah 2003); In Re B.D. Int'l Discount Corp. v. Chase Manhattan Bank, 701 F.2d 1071 (2d Cir. 1983). For that reason, I found that the statements made by defense counsel in the letter were "made in compromise negotiations" and therefore rightly suppressed under FRE 408.

Ferarolis now argues that she should have been permitted to admit the letter simply to show that, as of October 25, 2004, Defendants did not claim that the amount owed to Ferarolis was zero. I will reject this argument for the same reason that I earlier granted Defendants' motion in limine. The letter is excludable under FRE 408.

14

In any event, other evidence was admitted at trial which tended to support Ferarolis's argument that the idea that IRS was "hemorrhaging red ink" for years was concocted during litigation. This evidence included the e-mail from Richard Geisel, dated August 17, 2004, in which he stated: "Per your request I have attached the calculation for the IRS valuation at 6/30/04. Your share is equal to $360,922." Exhibit P-16. Ferarolis also admitted into evidence an August 21, 2004, e-mail he received from Turner, offering to sell him IRS and apparently accepting Geisel's figures regarding the shares: "We will sell you 100% of the outstanding stock for $650,000.00 (**that is about $75,000 under twice the calculated value of your phantom stock**)". Exhibit P-20 (emphasis supplied).

This permitted Ferarolis's attorney to make a strong argument to the jury that Defendants' argument that the phantom stock shares were worthless was "eleventh hour recalculation with no real good-faith basis." Transcript at 1.20. She did make this argument in her opening and closing arguments. Transcript at 1.19-20, Vo. 3 at 71-76. At closing, she said:

> They're asking you to swallow, hook, line and sinker, that these intelligent businessmen didn't notice that what they're saying now was a totally worthless company, was actually being valued by their own controller at over a million dollars.

Id at 75.

Thus, Ferarolis was able to – and did – make a strong argument in this regard. Nevertheless, whether the phantom stock was actually worthless was, as explained above, a factual determination for the jury, which decided the issue against Ferarolis. The jury's decision was not, however, the product of a wrongful exclusion of P-23.

5.      The Wage Payment and Collection Act

Finally, Ferarolis argues that he is entitled to compensation under the Pennsylvania Wage

Payment and Collection Law, 43 Pa. C.S.A. § 206.1, *et seq*., ("WPCL"), which provides a

statutory remedy for an employer's breach of its contractual obligation to remit wages.  Ferarolis

claims that IRS did not comply with § 206.6 which, in the case of a dispute over wages, requires

an employer to "give written notice to the employee or his counsel of the amount of wages which

he concedes to be due" and pay them within the time set by the statute.

It is a fundamental of the WPCL, however, that it does not create a right to compensation,

but only provides a statutory remedy when an employer breaches a contractual obligation to pay

earned wages:  the contract between the parties, and not the WPCL, governs whether specific

wages are owed.  De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003), citing

Antol v. Esposito, 100 F.3d 1111, 1117 (3d Cir. 1996) and Weldon v. Kraft, Inc., 896 F.2d 793,

801 (3d Cir. 1990).

The jury determined that Ferarolis did not have a right to compensation.  As explained

above, I do not find that Ferarolis is entitled to judgment notwithstanding the jury's verdict, or to

a new trial.  Accordingly, he is entitled to no relief under the WPCL.

B.      Defendants' Motion

Defendants have filed a motion under Rule 59 for a new trial on their counterclaims only.

They maintain that the jury's verdict was against the weight of the evidence:

> The evidence clearly justifies a new trial on defendants' counterclaims for tortious
> interference with contract, breach of contract, conversion and breach of fiduciary
> duty.  Ferarolis started another asset recovery company behind IRS's back while
> serving as IRS's president; solicited and stole IRS clients after leaving IRS;
> destroyed all e-mails on his IRS computer to eliminate any paper trail of his

16

contacts with IRS clients; destroyed all e-mails that he used to solicit clients from his neighbor's laptop and cost IRS over $79,000 in list client revenues.  In view of this treacherous behavior, the jury's decision to exonerate Ferarolis on the counterclaim should not stand.

Defendants' Memorandum in support of their motion at 9.

I will not grant this motion.  The only matters cited above that were uncontested at trial were: (a) the fact that Ferarolis erased his e-mails before leaving IRS and (b) the fact that he took steps to obtain a repossession licence, and to incorporate in Florida, while he was still working at IRS.

As to the first matter, it is true that Ferarolis admitting erasing the entire contents of his personal e-mailbox.  Transcript at 1.106-109.  The jury may simply have felt, however, that this was not a material violation of the Computer Agreement.  Edward Gall, IRS's former in-house information technology specialist, testified that all e-mail users deleted messages from time to time to prevent the file from growing too large.  Transcript at 2.55.  He also testified that he received non-business-related e-mails at times, some of them from Turner, and that he had even observed Turner playing online poker.  Id. at 2.56.

Ferarolis admitted that he, himself, had threatened to terminate an employee for violating the Computer Agreement, but he also explained that this employee had introduced a virus into the company's system which cost IRS three thousand dollars to repair.  Transcript at 1.106-107.  This might have been taken by the jury as some indication of the way in which the Computer Agreement was enforced.

17

It was also clear from the testimony of John Williams, a witness offered by Defendants who was employed by E-Source Group, IRS's computer support service, that IRS was unable to recover Ferarolis's e-mails. Transcript at 2.259-262. (This was partly due to IRS's failure to activate a thirty-day retention setting in their e-mail program; id. at 2.261-262). Thus, neither Defendants nor the jury could have known for certain whether Ferarolis actually erased his e-mails "to eliminate any paper trail of his contacts with IRS clients", i.e., whether he used his work computer to engage in activities benefitting an entity other than IRS. Ferarolis testified that he did not. Transcript at 1.59-60. Thus, not only was this a matter of fact appropriately decided by the jury, it was also a matter on which no direct evidence was available.

As to the steps Ferarolis took to establish himself in Florida, he testified at trial that he did not initially know whether he would be working with IRS or not when he returned to Florida. Transcript at 1.59. Mr. Gall confirmed this testimony, stating: "Stamatis, ultimately, conveyed to me, he didn't know what he was going to do. There were several options he was going to – I didn't know what he was going to do." Transcript at 2.63. The jury may have found that, as Ferarolis's attorney expressed it in her opening statement, starting his own business was a "Plan B" for Ferarolis in case plans for him to work for IRS from Florida did not coalesce. Transcript at 1.18.

The jury may also have been influenced by the undisputed testimony that IRS is not licensed to do business in Florida, and that the new business which Ferarolis eventually started is not licensed to do business in Pennsylvania, New Jersey, Delaware or Maryland, where IRS conducts its operations. Transcript at 1.63. Ferarolis's business operates only in Florida. Id. This being the case, the jury may have found that Ferarolis never acted against IRS's interests or violated his non-compete agreement, which required him to refrain from operating a competing

business within 100 miles of IRS.  Exhibit D-12.  On this evidence, the jury might easily have concluded that the $79,000 in fees Ferarolis received from entities that have also worked with IRS would never have gone to IRS in the first place, since IRS could not do their Florida recovery work.

In sum, I do not agree that the jury's verdict was against the weight of the evidence such that it has resulted in a miscarriage of justice.  For this reason, I will deny Defendants' Rule 59 motion.

V.     Conclusion

For the reasons set forth above, I now enter the following:


O R D E R

AND NOW, this             day of May, 2006, upon consideration of Plaintiff's Motion for Judgment Notwithstanding the Verdict or For A Partial New Trial, docketed in this case at Nos. 50 and 59, and the response thereto, it is

HEREBY ORDERED that the motion is DENIED; and it is further

ORDERED that, upon consideration of Defendants' Motion for New Trial on Defendants' Counterclaims, docketed in this case as No. 52, the motion is DENIED.


BY THE COURT:


/s/
_____

JACOB P. HART
UNITED STATES MAGISTRATE JUDGE

19